UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROBERT A. DAVIS,                                     :
                                                     :
                        Plaintiff,                   :
                                                     :
        -against-                                    :         **REPORT AND**
                                                     :         **RECOMMENDATION**
                                                     :
MICHAEL J. ASTRUE                                    :         **09 Civ. 4006 (KBF)(LMS)**
Commissioner of Social Security,                     :
                                                     :
                        Defendant.                   :
-------------------------------------------------------------X

**TO: THE HONORABLE KATHERINE B. FORREST, U.S.D.J.**

Robert A. Davis brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review

of the final decision of the Commissioner of Social Security (the "Commissioner"), which found

that Plaintiff was not entitled to disability insurance benefits under the Social Security Act (the

"Act"). Currently pending before the Court are Plaintiff's motion and the Commissioner's cross-

motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure. Docket ## 9, 10, 15, 16, 17. Because I find that the Commissioner's decision

regarding Plaintiff's claims employed the proper legal standards and is supported by substantial

evidence, I conclude, and respectfully recommend that Your Honor should conclude, that

Plaintiff's motion should be denied, the Commissioner's cross-motion should be granted, and the

case should be dismissed.

## I.   BACKGROUND

### A.   Procedural History

On January 27, 2006, Plaintiff filed his application for a period of disability and

disability insurance benefits, alleging September 23, 2005, as the onset date of his disability.[1]

Administrative Record ("AR") 67-71. Plaintiff alleged that he was "unable to work" due to

chronic back pain syndrome. Id. 15, 67. Plaintiff's application was denied on April 3, 2006, on

the ground that Plaintiff "could have performed sedentary work" between September 23, 2005,

the alleged onset date, and December 31, 2005, the date Plaintiff was last insured for disability

benefits. Id. 52. Thereafter, Plaintiff timely requested a hearing before an Administrative Law

Judge ("ALJ"). Id. 44-45. Plaintiff appeared in person for the June 13, 2007, administrative

hearing. Id. 366-91.

Following the June 13, 2007, hearing, the ALJ issued a decision on September 12, 2007,

finding that Plaintiff was not under a disability within the meaning of the Act "at any time from

September 23, 2005, the alleged onset date, through December 31, 2005, the date last insured."

Id. 12-20. Plaintiff filed a timely request for review of the ALJ's decision with the Appeals

Council, and on March 13, 2009, the Appeals Council denied Plaintiff's request, rendering the

ALJ's decision the final decision of the Commissioner. Id. 4-5, 8.

On April 22, 2009, Plaintiff commenced the instant action in this Court, alleging that the

---

[1]     Plaintiff filed a prior application for a period of disability and disability insurance
benefits on May 13, 2005, alleging a disability onset date of July 31, 2000. AR 12 n.1.
Plaintiff's application was denied by an ALJ on September 22, 2005. Id. On January 6, 2006,
the Appeals Council affirmed the September 22, 2005, decision, and in response, Plaintiff filed a
civil action in this Court on March 28, 2006, seeking review of the September 22, 2005,
decision. Id. On February 5, 2007, the Court affirmed the Commissioner's September 22, 2005,
decision. Davis v. Barnhart, 06 Civ. 1753 (CLB), slip op. (S.D.N.Y. Feb. 5, 2007); see Docket #
16, Ex. 2. No further  appeal was taken from that decision. See Docket # 16, Ex. 1 (Docket
Sheet for 06 Civ. 1753). Therefore, any claim that Plaintiff was disabled prior to September 23,
2005, is barred by res judicata. See EDP Med. Computer Sys., Inc. v. United States, 480 F.3d
621, 624 (2d Cir. 2007).
        Plaintiff filed the instant application for a period of disability and disability insurance
benefits, alleging that he became disabled on September 23, 2005, one day after the date of the
ALJ's prior determination. AR 12 n.1.

Commissioner's findings are not supported by substantial evidence and are contrary to law and regulation. Docket #1. On August 28, 2009, the Commissioner filed an Answer. Docket # 7. Thereafter, Plaintiff filed a motion for judgment on the pleadings on the grounds that the ALJ's decision failed to employ proper legal standards and was not supported by substantial evidence. Docket ## 9, 10. The Commissioner filed a cross-motion for judgment on the pleadings, arguing that the Commissioner's decision that Plaintiff was not disabled is supported by substantial evidence and should be affirmed. Docket ## 15, 16.

**B.**     **Medical Evidence**

     **1.**     **Evidence from Acceptable Medical Sources**[2]

      Plaintiff was treated by several physicians prior to September 23, 2005, the date on which Plaintiff alleges he became disabled.[3] Plaintiff's medical records include visits to Crystal Run Healthcare during the period of March, 2000, through March, 2004. AR 290-345. At Plaintiff's initial visit on March 31, 2000, with Dr. Judith Lin, he reported a history of lower back pain. Id. 325. At an office visit on September 15, 2000, Dr. Lin noted that Plaintiff's chronic low back pain was "being managed fairly well with ibuprofen." Id. 321. On September 25, 2000, an MRI scan of Plaintiff's lumbar spine was performed by radiologist Dr. Sam Mayerfield at Advanced Medical Imaging. Id. 207. The MRI scan reportedly showed degenerative disc disease at the

---

[2]      "Acceptable medical sources," which include "licensed physicians (medical or osteopathic doctors)," can provide evidence "to establish whether you have a medically determinable impairment(s)." 20 C.F.R. § 404.1513(a).

[3]      Medical evidence in the record notes, however, that Plaintiff injured his back at work on October 26, 1992, "while he was bending forward to lift a valve." AR 180 (October 18, 2005, report from chiropractor Dr. Margulies); see also id. 187 (August 9, 2001, report from chiropractor Dr. Brown), 196 (August 7, 2001, IME report from Dr. Freifeld), 229 (June 28, 2001, report of initial examination with Dr. Rauschenbach).

L1-L2, L3-L4, and L4-L5 levels, with Schmorl's nodes at multiple levels. Id. No evidence of paraspinal mass was found. Id. The MRI scan also showed a small central herniated nucleus pulposus at the L3-L4 level and a central and right paracentral herniated nucleus pulposus at the L4-L5 level. Id. Mild acquired spinal stenosis at the L3-L4 level was further noted. Id.

On January 3, 2001, Dr. Lin reported that Plaintiff had "4 herniated discs" and that Plaintiff was suffering from pain in the lumbar region radiating to the legs. Id. 318. Dr. Lin further noted that Plaintiff was taking Tylenol and Advil to manage his chronic back pain. Id. A physical examination showed that Plaintiff had normal spinal mobility and no kyphosis or scoliosis. Id. 319. The physical examination also showed that Plaintiff had no skeletal tenderness, joint deformity, or synovitis and had normal musculoskeletal range of motion and that Plaintiff had no sensory loss or motor weakness and his balance, gait, and coordination were intact. Id.

On June 28, 2001, Plaintiff visited Dr. Kenneth K. Rauschenbach for an initial examination. Id. 229. Plaintiff complained of "low back pain with radiation down his bilateral legs to the level of the knees." Id. Plaintiff stated that he felt the back pain "all the time" and that it was relatively severe, although the leg pain was "off and on." Id. Dr. Rauschenbach reported that Plaintiff had been treated by a chiropractor "with no relief up to this point" and had been diagnosed by another doctor with degenerative disc disease and recommended for discography. Id. Plaintiff went to Dr. Rauschenbach for a second opinion. Id. Upon examination, Dr. Rauschenbach noted that Plaintiff ambulated with a markedly antalgic gait, slightly hunched over in a rightward direction, and had a positive heel toe walk without weakness. Id. Plaintiff had decreased range of motion, point tender in the lumbar midline, mild paravertebral tenderness and spasm bilaterally, and mild piriformis tenderness. Id. Dr.

4

Rauschenbach further noted that Plaintiff had negative straight leg raises bilaterally, and sensation was intact. Id. Dr. Rauschenbach reviewed Plaintiff's MRI results, which showed that Plaintiff had degenerative disc disease at the L1-L2, L2-L3, L3-L4, and L4-L5 levels, with some small disc herniations and some mild acquired stenosis. Id. Dr. Rauschenbach recommended that Plaintiff get epidural steroid injections and agreed with the recommendation that he get discography as well. Id. He noted that spinal fusion might also be necessary. Id.

On August 7, 2001, Plaintiff visited Dr. Gerald Freifeld, a neurosurgeon, for an independent medical examination. Id. 196-99. Plaintiff reportedly had received an epidural injection at St. Luke's Hospital without any improvement. Id. 197. Upon conducting a neurological examination of Plaintiff, Dr. Freifeld noted that Plaintiff was able to sit in a chair comfortably and had no trouble getting on and off the examination table or getting undressed. Id. Plaintiff did not wear a lumbar support or walk with a cane. Id. Plaintiff could not perform heel and toe walking because of diffuse pain in the lower extremities, but he had normal strength, tone, and motility in the upper and lower extremities, with no atrophy or fasiculations. Id. 197-98. Sensation was also intact. Id. 198. Dr. Freifeld reported that there was "marked tenderness without any spasm noted of the lumbosacral regions bilaterally," but there was no sacrosciatic notch tenderness or gluteal myalgia. Id. Dr. Freifeld's impression was that Plaintiff had a "post-traumatic lumbosacral myofascial syndrome with subjective radiculopathic features involving both lower extremities." Id. Dr. Freifeld noted that it was "rather bizarre" that Plaintiff's back injury from almost nine years earlier had not improved after the conservative treatment that had been administered, including chiropractic care and epidural blocks. Id. Dr. Freifeld stated that he could not comment as to the need for additional neurodiagnostic testing or work restrictions since he had not seen any of Plaintiff's MRI scans. Id.

On August 8, 2001, Dr. Freifeld examined the films of Plaintiff's September 25, 2000, MRI scan. Id. 195.[4] Dr. Freifeld noted that the MRI showed that Plaintiff had two level degenerative disc disease at the L1-L2, L3-L4, and L4-L5 levels with Schmorl's nodes at T11-T12 and T12-L1. Id. Dr. Freifeld also noted that there was a small asymmetrical disc bulge at the L4-L5 level on the right side, "contrary to [Plaintiff's] clinical complaints of left back and radicular pain," and a significant annular bulge at the L3-L4 level. Id. Dr. Freifeld stated that the MRI findings did not indicate significant disc herniation that would require surgical intervention, nor did he recommend any additional neurodiagnostic testing. Id. Dr. Freifeld concluded that Plaintiff did not have "any neurological disability nor any work restrictions that would require any treatment in my neurological/neurosurgical discipline." Id.

On October 5, 2001, Plaintiff visited Dr. William Gotsis. Id. 309-10. Although Dr. Gotsis noted lower back pain as a chronic condition, in his review of systems, he reported that Plaintiff was "[n]egative for bone/joint symptoms, myalgias, back pain, [or] bone pain." Id. Upon examination, Dr. Gotsis reported that Plaintiff had "grossly normal" range of motion and did not have skeletal tenderness, joint deformity, or any evidence of synovitis. Id. 310. Dr. Gotsis also reported that Plaintiff did not have gross motor, cranial nerve, or other focal deficits. Id. On October 31, 2001, Plaintiff made a follow-up visit to Dr. Gotsis. Id. 306-07. Dr. Gotsis again reported the absence of bone or joint symptoms, myalgias, and back or bone pain. Id. 306. Upon examination, Dr. Gotsis found that Plaintiff had "normal" range of motion, no sensory loss or motor weakness, and his balance, gait, and coordination were intact. Id. 307.

On January 30, 2002, Plaintiff returned to Dr. Rauschenbach. Id. 228. Plaintiff

---

[4]     Dr. Freifeld's report erroneously states that he looked at films of an MRI from "5/25/00." AR 195.

complained of pain "across his low back, going down both legs," which "even shoots up to his neck," but there was no numbness or tingling. Id. Dr. Rauschenbach noted that Plaintiff had been seeing a chiropractor for the last ten years "without relief of his symptoms, which have been episodic." Id. He also noted that epidural injections were ineffective in relieving Plaintiff's back pain. Id. Upon examination, Dr. Rauschenbach reported that Plaintiff had positive antalgic gait with normal ambulation and positive heel toe walk, which both caused Plaintiff pain. Id. Plaintiff had tenderness along the paralumbar musculature and the lumbar midline but no piriformis tenderness. Id. There was no sensory deficit. Id. Dr. Rauschenbach reported that Plaintiff had pain with "internal external rotation of the knees, flexion, extension of the knees and hip motion." Id. Dr. Rauschenbach noted that Plaintiff had a "very confusing evaluation at this time" because Plaintiff appeared to be suffering from radiculopathy, although his stretch signs were positive. Id. Dr. Rauschenbach further noted that Plaintiff had no frank weakness or sensory deficit. Id. Dr. Rauschenbach noted that Plaintiff would possibly need discography and spinal fusion. Id.

On May 8, 2002, Plaintiff visited Dr. Rauschenbach with complaints of low back pain. Id. 226. Dr. Rauschenbach reported that Plaintiff had "no numbness, tingling, no shooting down the legs," noting that the pain was primarily in Plaintiff's lower back. Id. Dr. Rauschenbach also reported that physical therapy, anti-inflammatories, stretching, and strengthening exercises had been unsuccessful in alleviating Plaintiff's pain. Id. On June 5, 2002, Plaintiff returned to Dr. Rauschenbach, complaining of low back pain that limited him to mild bending and lifting activities, but there was no "shooting down the legs," numbness, or tingling. Id. 224. Dr. Rauschenbach reported that Plaintiff's MRI showed only mild stenosis, and there were no signs of radiculopathy. Id. Dr. Rauschenbach suggested that Plaintiff follow an exercise program and

continue his lumbar support.  Id.

On July 17, 2002, Plaintiff returned to Dr. Rauschenbach for a follow-up regarding his lower back pain.  Id. 222.  Plaintiff complained that he felt pain throughout his entire back.  Id. A physical examination revealed that Plaintiff had decreased range of motion and forward flexion only to approximately 40 degrees "without grabbing his back in severe pain."  Id. Plaintiff ambulated with a slightly antalgic gait.  Id.  Dr. Rauschenbach reported that Plaintiff's straight leg raises were negative while seated but positive while lying down, increasing with flexion of the knee and hip, which indicated a lack of stretch signs.  Id.  Sensation was intact.  Id. Any palpation in the lower lumbar area caused Plaintiff significant pain.  Id.  Following the examination, Dr. Rauschenbach concluded that he could not find "any signs of pressure on the nerves or causing any sort of radicular symptoms."  Id.  Dr. Rauschenbach opined that degenerative disc disease might be the cause of Plaintiff's lower back pain.  Id.

On August 7, 2003, Plaintiff made a return visit to Crystal Run Healthcare, at which time he was assessed with acute exacerbation of chronic back pain.  Id. 298.  Crutches were ordered for Plaintiff, and he was prescribed Lortab and Flexeril.  Id.  It was noted that Plaintiff was not a surgical candidate.  Id.  On November 14, 2003, Plaintiff visited Dr. Lin with complaints of diffuse myalgias, joint pains, back spasms, and rib pain.  Id. 293.  The complaints allegedly arose from an incident in which Plaintiff was "[m]oving mattresses around and had one fall on him."  Id.  Dr. Lin assessed "myalgias, muscle strain" and prescribed Flexeril to relieve Plaintiff's pain and back spasms.  Id.

On January 14, 2004, Plaintiff returned to Dr. Lin complaining of back spasms.  Id. 292. Dr. Lin noted that Plaintiff had begun seeing a chiropractor, Dr. Carol Ann Malizia, with some improvement.  Id.  Dr. Lin further noted that nightly samples of Skelexin seemed to be

8

improving Plaintiff's condition. Id. Plaintiff was reported to suffer from chronic pain in his neck and back. Id. On March 26, 2004, Plaintiff was seen by Dr. Irina Anshelevich, a physician at Crystal Run Healthcare, for complaints of coughing, congestion, and sore throat symptoms. Id. 290. Dr. Anshelevich reported that Plaintiff did not have any back or joint pains. Id. Upon examination, Dr. Anshelevich reported that Plaintiff had no kyphosis or scoliosis, no spinal tenderness to palpation or percussion, no skeletal tenderness or joint deformity, and grossly normal range of motion. Id. 291. Dr. Anshelevich noted that for his chronic lower back pain, Plaintiff was taking Flexeril as needed and was receiving chiropractic care. Id.

On April 14, 2004, Plaintiff underwent a second MRI scan of his lumbosacral spine. Id. 206. The MRI examination was performed by radiologist Dr. Mahesh Kinkhabwala at Advanced Medical Imaging. Id. The examination revealed evidence of narrowing and degeneration of the disc spaces between the L2-L3 and L4-L5 levels, as well as dehydration of those discs. Id. Dr. Kinkhabwala also found a posterior bulging of the disc at the L2-L3 level with some compression of bilateral exiting nerve roots. Id. A small right paracentral herniation of the disc at the L4-L5 level was also noted along with compression of the anterior portion of the thecal sac. Id. Schmorl's nodes were found at the T11, T12, L1, and L4 levels. Id. In comparison to Plaintiff's previous MRI scan, performed on September 25, 2000, Dr. Kinkhabwala noticed "no significant radiological change." Id.

On April 21, 2004, approximately two years after his last visit, Plaintiff returned to Dr. Rauschenbach for treatment of his lower back pain. Id. 219. Plaintiff denied any "major changes," but noted that his back pain traveled down both legs about two times per week, occasionally causing him to take a muscle relaxant. Id. Plaintiff had no sensory changes or marked weakness. Id. Upon examination, Dr. Rauschenbach reported that Plaintiff was able to

flex to approximately 60 degrees, and his side bending and rotation were limited.  Id.  Plaintiff's

muscle strength was 4+/5 and was equal and symmetrical.  Id.  Plaintiff had no sensory deficit.

Id.  Plaintiff reported that his low back was "slightly tender to palpation globally."  Id.  Dr.

Rauschenbach reviewed Plaintiff's April 14, 2004, MRI, which he stated showed moderate spinal

stenosis and degenerative disc disease from the L1 level down to the L4-L5 level.  Id.  Dr.

Rauschenbach also stated that the MRI revealed marginal bulging discs and a large anterior

herniation at the L2 level, which was "of no obvious clinical consequence."  Id.  Dr.

Rauschenbach suggested a decompression and fusion "with no guarantees," but Plaintiff declined

the treatment.  Id. 219-20.  Dr. Rauschenbach noted that he did not think that Plaintiff could

return to his normal activities but that continued chiropractic care would be beneficial.  Id. 220.

Dr. Rauschenbach also encouraged Plaintiff to use a brace and gave Plaintiff a new lumbar

support with some ice.  Id.  Dr. Rauschenbach told Plaintiff to follow up with him "on an as-

needed basis."  Id.

　　　　During the period of September 23, 2005, the alleged onset date of Plaintiff's disability,

through December 31, 2005, the date Plaintiff was last insured for disability benefits, there is no

evidence presented in the Administrative Record from any acceptable medical sources.

Following his date last insured, however, and about 20 months since his last examination,

Plaintiff returned to Dr. Rauschenbach for an examination on January 4, 2006.  Id. 217.  During

the examination, Plaintiff complained that he could not "get up on his right leg due to pain in his

low back into his legs."  Id.  Dr. Rauschenbach reported that Plaintiff walked with a slightly

antalgic gait but had no numbness or tingling and no gross weakness with dorsiflexion, plantar

flexion, or EHL.  Id.  Sensation was intact.  Id.  Dr. Rauschenbach performed new x-rays on

Plaintiff, but the x-rays revealed "no major change" from x-rays taken in 2002.  Id.  However,

several degenerative changes were noted, especially at the L5-S1 level, along with mild

degenerative changes at the L4-L5 levels. Id. Dr. Rauschenbach did not find spondylolisthesis.

Id. Dr. Rauschenbach noted that the current treatment plan consisted of continuing chiropractic

care and the use of anti-inflammatories. Id. Dr. Rauschenbach prescribed Plaintiff Ultracet for

severe pain and recommended that Plaintiff visit two neurosurgeons for "possible surgical

intervention" because Plaintiff's injury had not improved. Id.

On June 26, 2006, Plaintiff visited spine surgeon Dr. Kenneth K. Hansraj for the first

time, approximately six months following the expiration of his date last insured. Id. 256-61.

Plaintiff complained of severe back, neck, and leg pain with numbness and pins and needles in

his back, arms, and legs and weakness in his hands and lower legs. Id. 256. Dr. Hansraj

proposed a conservative form of treatment which included cervical and lumbar stabilization

exercises, the usage of a brace, hot showers, traction, massages, gentle physical therapy, and

osteopathic and chiropractic treatments. Id. 259. Dr. Hansraj also recommended that Plaintiff

use a sequential stimulator to relieve pain and advised Plaintiff to avoid bending, twisting,

lifting, and reaching activities. Id. 260-61.

Plaintiff returned to Dr. Hansraj on July 26, 2006, after receiving new x-rays and an

MRI. Id. 262-65. Dr. Hansraj reported that the July 14, 2006, x-rays of Plaintiff's lumbar spine

demonstrated that there was partial lumbarization of the S1 vertebral body, although vertebral

body height and disc space height appeared to be maintained. Id. 263. No evidence of fracture

or dislocation of the lumbosacral spine was found. Id. The x-rays also demonstrated that there

were facette hypertrophic changes at the levels between L4-L5 and L5-S1, and minimal anterior

and lateral osteophytes in the mid lumbar spine. Id. Overall, the x-ray showed mild

degenerative changes with no fracture or subluxation. Id.

11

Dr. Hansraj also reviewed Plaintiff's July 14, 2006, x-rays of his cervical spine. Id. 263-64. The x-rays showed no evidence of fracture or dislocation and preservation of the normal cervical lordotic curve. Id. 264. Vertebral body height and disc space height appeared to be maintained. Id. Dr. Hansraj reported that there was anatomic alignment of the posterolateral masses and asymmetry to the C1-C2 relationship. Id. Dr. Hansraj further reported that there was mild uncinate process hypertrophy which caused mild narrowing of the bilateral C3-C4 and C4-C5 neural foramina. Id. Dr. Hansraj assessed congenital or developmental anomaly at the C1-C2 level and mild diffuse degenerative changes which were worse at the C3-C4 and C4-C5 levels. Id.

Lastly, Dr. Hansraj reviewed a July 14, 2006, MRI of Plaintiff's lumbar spine, which revealed a small bulging annulus at the L1-L2 level without central or neural canal stenosis and a bulging annulus with annular tear and mild facette hypertrophic changes causing mild right neural canal stenosis at the L2-L3 level. Id. 264. Dr. Hansraj further reported small central disk herniations with annular tear at the L3-L4 and L4-L5 levels. Id. 264. Mild facette hypertophic changes were also noted at the L3-L4 level, which caused mild bilateral neural canal narrowing. Id. Dr. Hansraj reported the presence of facette and ligamentum flavum hypertrophy at the L4-L5 level, which caused moderate to severe right neural canal stenosis. Id. Dr. Hansraj further reported Schmorl's nodes at the T11, T12, and L1 levels, noting no additional disc bulge, protrusion, or herniation in the lumbar spine. Id. Visualized segments of the thoracic cord, conus, and cauda equine were deemed unremarkable. Id. 265. Dr. Hansraj's impression was diffuse multilevel degenerative changes, which were worse at the L4-L5 level, with moderate to severe right neural canal stenosis. Id.

On September 21, 2006, an EMG and nerve conduction study were performed on

12

Plaintiff by Dr. Ravichandra Reddy. Id. 282-84.  Dr. Reddy noted that the study was "abnormal." Id. 284.  Dr. Reddy's impression was that Plaintiff had left sided, chronic radiculopathy at the L5-S1 level. Id.  There was no evidence of lower extremity compression neuropathy. Id.  On October 9, 2006, Plaintiff returned to Dr. Hansraj, who reviewed the EMG. Id. 269.  Dr. Hansraj's clinical impression was that Plaintiff suffered from lumbar herniation, lumbar degenerative disc disease, and lumbar spinal stenosis. Id.  Dr. Hansraj recommended decompression of the lumbar spine. Id.

### 2.   Evidence from Other Sources[5]

On August 9, 2001, Plaintiff visited chiropractor Howard M. Brown for an independent chiropractic examination and evaluation of his back injuries. Id. 187-94.  Plaintiff informed the chiropractor that he received chiropractic treatment "two to three times per month" and that his symptoms were worsened by standing, walking, sitting, bending, lifting, twisting, and coughing. Id. 188-89.  Based upon both a physical examination and a review of medical records, Dr. Brown diagnosed Plaintiff with lumbar sprain/strain, degenerative disc disease throughout his lumbar spine, and disc herniations at L3-L4 and L4-L5. Id. 193.  Dr. Brown stated that chiropractic treatment one to two times per month was both "reasonable and necessary," although he concluded that "it is clear that [Plaintiff] will not improve further." Id.  Dr. Brown opined that Plaintiff had "reached maximum medical improvement with chiropractic care." Id.

On November 4, 2002, Plaintiff visited nurse practitioner Michael Zychowicz seeking a second opinion. Id. 184-85.  Plaintiff complained of "significant back pain and bilateral leg pain

---

[5]      "Other sources" who can provide evidence "to show the severity of your impairment(s) and how it affects your ability to work," include medical sources such as nurse-practitioners and chiropractors.  20 C.F.R. § 404.1513(d)(1).

which traverses down to [t]he level of his knees bilaterally." Id. 184.  However, Plaintiff had no

numbness or tingling into his lower extremities. Id.  N.P. Zychowicz examined Plaintiff and

reviewed an MRI of his lumbar spine from 2000. Id. 184-85.  N.P. Zychowicz's impression was

that Plaintiff suffered from degenerative disc disease with low back pain. Id. 185.  N.P.

Zychowicz consulted with spine surgeon Dr. Mitchell S. Garden, who believed that Plaintiff was

"not a good surgical candidate." Id.  Even though Dr. Garden agreed with the recommendation

of other doctors that Plaintiff undergo a discography, Dr. Garden explained to Plaintiff that

discography and spinal fusion might not significantly improve his pain. Id.

On October 18, 2005, Plaintiff visited chiropractor Jeffrey Margulies for an independent

medical examination, complaining of lower back pain that extended to the legs bilaterally. Id.

180-83.  Plaintiff also suffered from pain in his mid and upper back and his shoulders, as well as

from headaches. Id. 180.  Plaintiff did not take any prescription medications but did take

Tylenol on an as needed basis and used heat and ice at home. Id. 181.  The chiropractor noted

that Plaintiff was not doing any lower back exercises, but he did "walk a little." Id.  Upon

examination, Dr. Margulies reported that Plaintiff's carriage and gait demonstrated difficulty and

his movements were restricted. Id.  The chiropractor further reported with respect to Plaintiff's

cervical spine that flexion, extension, left and right rotation and lateral flexion were all limited

and painful. Id.  Deep tendon reflexes were all 2 bilaterally, and sensation was normal. Id.

Thoracolumbar ranges of motion were limited and caused lower back pain. Id.  Dr. Margulies

found moderate hypertonic musculature in the thoracic and lumbar areas bilaterally. Id. 182.

Dr. Margulies diagnosed lumbar sprain/strain and lumbar disc lesion with a radicular

component. Id.  The chiropractor deemed Plaintiff's prognosis "poor" and noted that maximum

chiropractic improvement had been achieved. Id.  Dr. Margulies anticipated that Plaintiff's

14

condition would not improve on a permanent basis.  Id.

On March 14, 2006, chiropractor Carol Ann Malizia completed a report on Plaintiff's back injury.  Id. 234-36.  The report did not specify whether the chiropractor treated Plaintiff during the period at issue, September 23, 2005, through December 31, 2005.  Dr. Malizia diagnosed a multilevel disc herniation in the lumbar spine, resulting in sciatic neuritis complicated by subluxations in the lumbar spine.  Id. 236.  She noted that Plaintiff had shown some overall improvement in disc size, but also noted that Plaintiff remained unstable and any activity of daily life had the potential to "reactive [sic] and reaggravate the lower back pain and the numbness in the leg with difficulty walking."  Id. 235.  Dr. Malizia noted that Plaintiff had diminished range of motion in the lumbar spine and that his cervical range of motion also produced lumbar pain.  Id.  Dr. Malizia opined that Plaintiff could not sit for any period of time in excess of ten minutes, walk for any amount of time in excess of ten minutes, and had difficulties with driving.  Id. 236.  Dr. Malizia further opined that Plaintiff was totally disabled from his former occupation and "quite frankly from any occupation at this point and time."  Id.  The chiropractor stated that Plaintiff could not work on any machinery, climb ladders, or be exposed to humidity or weather changes due to his lumbar spine instability.  Id.

On February 13, 2007, Dr. Malizia completed a form describing Plaintiff's residual functional capacity.  Id. 246-51.  The chiropractor reported that Plaintiff could occasionally lift and carry 20 pounds or less.  Id. 246.  She also reported that Plaintiff could sit for one hour and stand or walk for 20 minutes without interruption.  Id. 247.  Dr. Malizia further noted that during an 8 hour work day, Plaintiff could sit for 2 hours, stand for 2 hours, and walk for one hour, but would need to lie down intermittently for the rest of the time.  Id.  The chiropractor also stated that at times Plaintiff would need to use a cane to ambulate.  Id.  Dr. Malizia reported that

Plaintiff could frequently reach, handle, finger, and feel and could occasionally push or pull. Id. 248. The chiropractor noted that Plaintiff could frequently operate foot controls with both feet. Id. According to Dr. Malizia, Plaintiff could also occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but could never climb ladders of scaffolds. Id. 249. The chiropractor assessed that Plaintiff had no visual or hearing impairments, id., and could frequently operate a motor vehicle and be exposed to dust, odors, fumes and pulmonary irritants but could only occasionally tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, extreme heat and cold, and vibrations. Id. 250. Plaintiff could only tolerate a moderate noise level. Id. Dr. Malizia noted that Plaintiff could shop, prepare simple meals and feed himself, care for his hygiene, and handle papers. Id. 251. However, Plaintiff could travel without a companion, ambulate on his own, and climb stairs only at times and could not walk one block on rough or uneven surfaces or use public transportation. Id.

### C.  **Other Evidence**

#### 1.  **Evidence from State Agency Disability Examiner**

On March 27, 2006, Disability Examiner Mary Mayer completed a report regarding Plaintiff's residual functional capacity. Id. 238-43. Mayer's primary diagnosis was lumbar sprain/strain, and her secondary diagnosis was herniated disc of the lower back. Id. 238. The Physical Residual Functional Capacity Assessment stated that Plaintiff was able to occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for at least 2 hours in an 8 hour workday, sit for a total of about 6 hours in an 8 hour workday, and push or pull without limitations. Id. 239. The report also assessed that Plaintiff could never climb, balance, kneel, crouch, or crawl, but could occasionally stoop. Id. 240. No manipulative, visual, communicative, or environmental limitations were assessed. Id. 240-41. Mayer opined that

16

Plaintiff's statements that he had trouble standing, walking, sitting, lifting, climbing stairs, and kneeling were "nonspecific." Id. 242. However, she found that Plaintiff's statement that he could lift no more than 10 pounds was specific. Id. Mayer also noted that Plaintiff had an MDI (medically determinable impairment) which could reasonably be expected to cause the pain and functional limitations noted in the Physical Residual Functional Capacity Assessment. Id. Mayer further noted that Dr. Malizia's March 14, 2006, report stating that Plaintiff was totally disabled from his former occupation was "not [from] an acceptable medical source and therefore granted no weight," and that this was "an issue reserved for the Commissioner." Id.

### 2.    **Evidence from Disability Records**

On February 16, 2006, P. Lahiff completed a disability report after conducting a face-to-face interview with Plaintiff. Id. 83-91. Lahiff stated that Plaintiff's alleged onset date was September 23, 2005, and his date last insured was December 31, 2005. Id. 83. Lahiff observed that Plaintiff had no difficulties hearing, reading, breathing, understanding, concentrating, talking, sitting, seeing, writing, or using his hands. Id. 84. However, Lahiff noted that Plaintiff had difficulties answering, standing, and walking. Id. Lahiff commented that Plaintiff had a slight slur and was not well educated and that he was stiff and walked with a slight limp upon leaving the interview. Id.

While interviewed, Plaintiff stated that his constant back pain limited his ability to work because the pain worsened when he exerted himself and that he had trouble standing, walking, sitting, and lifting. Id. 86. Plaintiff stated that his injury first began to bother him on July 31, 2000, at which point he stopped working. Id. 86-87. While employed, Plaintiff was an assembler for a steam trap manufacturer, working five days per week for eight hours each day. Id. 87. Plaintiff noted that his job required him to walk for two hours, stand for five hours, sit

17

for one hour, climb for one hour, stoop for three hours, and kneel for one hour each day. Id. 87-88. He also stated that his job required him to crouch for two hours, crawl for one hour, handle, grab or grasp big objects for eight hours, reach for one hour, and write, type or handle small objects for one hour each day. Id. 88. Plaintiff also lifted and carried steam valves and parts weighing as heavy as 60 pounds. Id. The disability report further stated that Plaintiff had completed his high school education in 1975. Id. 90.

In an undated disability report submitted to the Social Security Administration, Plaintiff stated that he worked until July 31, 2000, as an assembler in a factory. Id. 117-18. He stated that he walked, stood, stooped, knelt, crouched, reached, handled, grabbed or grasped big objects, and wrote, typed or handled small objects for 8 hours per day at his job. Id. 118. He also stated that he did not sit or climb on the job, noting that the heaviest weight he lifted was 10 pounds and that the weight he frequently lifted was 10 pounds. Id.[6] In another undated disability report, Plaintiff stated that he required assistance to put on his socks, underwear, and pants in the morning after showering. Id. 130. Plaintiff also noted that he needed help getting in and out of the shower. Id.

On March 5, 2006, Plaintiff's friend, Mary Cable, completed a "Function Report – Adult" for Plaintiff. Id. 94-104.[7] Cable reported that Plaintiff needed help to get in and out of bed, to

---

[6]     In a work history report signed by Plaintiff on March 15, 2006, he stated that in his job as an assembler, he walked 8 hours a day, stood 8 hours a day, sat ½ hour a day, stooped 3 hours a day, knelt 2 hours a day, crouched 2 hours a day, handled, grabbed or grasped big objects 8 hours a day, and wrote, typed or handled small objects 8 hours a day. AR 106. He also stated that he never climbed or crawled. Id. Plaintiff reported that the heaviest weight he lifted was 50 pounds and that he frequently lifted between 25 and 50 pounds. Id.

[7]     Cable signed the report on March 5, 2006, AR 101, but Plaintiff signed it on March 15, 2006. Id. 104.

get in and out of the shower, and to get dressed. Id. 95. She noted that Plaintiff had trouble walking up and down the stairs to her apartment, had trouble sitting and standing, could not cook for himself, and could not do house cleaning. Id. 95-97. Cable also reported that Plaintiff had both crutches and a walker that he used sometimes to get around the apartment, particularly when he was home alone. Id. 100. However, Cable noted that Plaintiff went food shopping at times and did crossword puzzles during the day to keep busy. Id. 95, 98. Plaintiff also helped with folding and putting away his laundry. Id. 97. Cable further stated that Plaintiff could drive her car "when he feels he's having a good day." Id. Socially, Plaintiff spent time with his children and grandchildren and called his sisters once a week. Id. 99, 104.

### 3. Evidence from the June 13, 2007, Hearing

At the hearing before the ALJ on June 13, 2007, Plaintiff stated that on September 23, 2005, he became "[u]nable to work due to [his] back." Id. 369. Plaintiff alleged that he hurt his back lifting a valve at his job. Id. Plaintiff testified that he hurt his back in 2000 or 2001. Id. 371, 373. Plaintiff stated that his job required him to stand and did not permit him to sit down. Id. 372. Plaintiff testified that after he hurt his back in 2000 or 2001, he returned to work, but his back "kept on getting worse." Id. 373.[8]

Plaintiff testified that he had difficulty walking distances of between 100 and 200 feet, and his legs would "go numb . . . and get tingling . . . and . . . pain." Id. 374. Plaintiff stated that he could walk short distances within an office or room. Id. Plaintiff also noted that he had

---

[8]     As set forth in footnote 3, supra, medical evidence in the record reflects that Plaintiff injured his back at work on October 26, 1992. Moreover, other evidence in the record shows that Plaintiff stopped working in 2000, not 2001, see id. 61-62, 64 (earnings records); see also id. 87 (Disability Report states that Plaintiff stopped working on July 31, 2000), and Plaintiff reported to Dr. Lin on September 15, 2000, that he "recently lost his job due to an argument at work." Id. 321.

19

problems sitting for more than five or ten minutes without experiencing back pain that traveled to his legs. Id. 375. In response to a question asking Plaintiff what position he spent most of the day in, Plaintiff responded that he did crossword puzzles during the day. Id. Plaintiff also stated that he tried to do the dishes or laundry "depend[ing] on how [his] back [was]" and that he drove a car and sometimes drove to his doctors' appointments. Id. 375-76. Plaintiff testified that he went outside during the day and sat in a chair for five to ten minutes or went for walks "right around [his] house." Id. 377. Plaintiff further stated that he often had a difficult time getting out of bed or into the bathroom without help from his wife. Id. 379.

Plaintiff testified that he was not currently looking for work because many places refused to hire someone with a back injury. Id. 377-78. Plaintiff noted that he looked for work immediately following his termination at Spence Engineering but he was "refused because of [his] back injury." Id. 386. Plaintiff stated that he felt he was able to do "light duty" work, although he denied that he had the ability to work five days per week for eight hours each day because he had too much pain in his legs and back. Id. 378, 386-87. Plaintiff testified that he felt increased "sharp," "stabbing" pains in comparison to the pains he felt in 2005. Id. 382. At the time of the hearing, Plaintiff testified that he took over-the-counter Tylenol and had a prescription for Percocet to manage his pain. Id. 382, 384.[9] Plaintiff had only begun taking Percocet one week prior to the date of the hearing. Id. 384. Plaintiff noted that his pain had become exceptionally worse in the last few months because of some unknown factor. Id. 385.

_____

[9]     Plaintiff also testified that he took medication for a slight blockage, but that his coronary condition only required him to "be on a light diet." AR 382-83. Plaintiff testified that he had taken anti-depressants in the past, but he was not claiming disability based on a mental impairment. Id. 389.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

### B.   Determining Disability

In the context of disability benefits, the Act defines "disability" as the inability "to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow. See 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity." Id. at § 404.1520(a)(4)(i),(b). If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant was not disabled. Id. Second, the Commissioner considers the medical severity of the claimant's impairments. Id. at § 404.1520(a)(4)(ii). The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities." Id. at § 404.1520(c). Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. See id. at § 404.1520(a)(4)(iii),(d). If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity. See id. at § 404.1520(e). Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work. See id. at § 404.1520(a)(4)(iv),(e)-(f). Finally, if it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he or she can make an adjustment to other work. See id. at § 404.1520(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citations omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  DeChirico, 134 F.3d at 1180 (citation omitted).

## III.   DISCUSSION

In deciding Plaintiff's case, the ALJ applied the required five-step sequential analysis set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of September 23, 2005, through the date of the ALJ's decision.  AR 15.  Second, he found that the medical evidence established that Plaintiff suffered from chronic back pain syndrome.  Id.  The ALJ determined that this impairment was "severe" within the meaning of the Social Security Regulations.  Id.  Third, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.  Id. 17.  Therefore, the ALJ proceeded to determine Plaintiff's residual functional capacity and concluded that Plaintiff had a residual functional capacity for "the full range of sedentary exertion level work . . . through [Plaintiff's] date last insured."  Id. 19.  He found that Plaintiff maintained the residual functional capacity "to sit for a total of up to and including 8 hours and stand/walk a total of up to and including 4 hours during the course of an 8-hour work day; and has the ability frequently and occasionally to lift and carry objects weighing up to and including 10 pounds.  Additionally, [Plaintiff] cannot engage in bending or stooping more than 50% of the time during a typical work day, and he cannot perform climbing activities."  Id.

23

At the fourth step in the analysis, the ALJ found that Plaintiff was unable to perform past relevant work, which required a significant amount of standing, walking, stooping, and crouching. Id. At the fifth step, the ALJ consulted the medical vocational guidelines ("the grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, taking into account Plaintiff's residual functional capacity, age, education, and work experience. Id. The ALJ found that Plaintiff was 48 years old at the time of his alleged disability and 49 years old as of his date last insured. Id. Thus, the ALJ determined that Plaintiff was a "younger individual age 45-49" at all pertinent times. Id. The ALJ also found that Plaintiff had at least a high school education, was capable of communicating in English, and that Plaintiff's previous relevant work was "unskilled." Id. Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ applied Medical-Vocational Rule 201.21 to find that Plaintiff was "not disabled." Id. 20. Consequently, the ALJ determined that Plaintiff was not under a disability within the meaning of the Act at any time from September 23, 2005, the alleged onset date, through December 31, 2005, the date last insured, and concluded that Plaintiff was not entitled to a period of disability or disability insurance benefits under the Act. Id.

In his motion papers, Plaintiff contends that the ALJ's decision is not supported by substantial evidence and contains errors of law. See Pl.'s Mem. of Law in Supp. (Docket # 10) at 6. Specifically, Plaintiff contends that the Commissioner: 1) erred in relying exclusively on the Medical-Vocational Guidelines; 2) failed to set forth Plaintiff's residual functional capacity in a manner sufficient to allow a reviewing court to carry out its reviewing function; 3) failed to properly assess Plaintiff's credibility and his alleged symptoms; and 4) failed to give proper weight to the opinion of Plaintiff's chiropractor or to fully develop the record. Id. Thus, Plaintiff asks this Court to find that he is entitled to disability benefits and/or to remand the case to the

Commissioner for further fact finding.  Id.  In response, the Commissioner cross-moves for judgment on the pleadings, contending that the ALJ's decision is supported by substantial evidence and should be affirmed.  Docket # 15.

### A.   The Use of the Medical-Vocational Guidelines

Plaintiff argues that the ALJ erred in utilizing the Medical-Vocational Guidelines to determine that he was not disabled because the record suggested that he suffered from significant nonexertional impairments, thus requiring the testimony of a vocational expert.[10]  See Pl.'s Mem. of Law in Supp. at 9-11.  In this regard, Plaintiff points to the records of Dr. Rauschenbach (AR 210-29), which Plaintiff contends "chronicle [his] pain and limitations for bending and carrying"; the narrative and residual functional capacity assessment provided by Dr. Malizia (AR 234-36, 246-51)[11]; the records of Dr. Hansraj (AR 256-70), which Plaintiff claims "catalogue[] [Plaintiff's] exertional and nonexertional impairments . . . specifically stating that [Plaintiff] avoid bending, lifting, twisting and reaching"; and the records of Crystal Run Healthcare (AR 290-345), which "consistently list Low Back Pain and Depressive Order NEC as chronic conditions."[12]

---

[10]     A nonexertional impairment is "[any] impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull.  This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities."  SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983).

[11]     As discussed in Section III.D., infra, because Dr. Malizia is not an "acceptable medical source," the ALJ was not required to give her opinion controlling weight.

[12]     Plaintiff testified at the administrative hearing that he was not claiming disability based on a mental impairment, AR 389, and, in any event, the Crystal Run Healthcare records state as early as November 7, 2003, "Depressive disorder NEC, Resolved."  Id. 294; see also id. 292 (record from 1/14/2004, which notes "not depressed"), 291 (record from 3/26/2004, which notes "No evidence of depression or anxiety").

Although the use of the grids may be inappropriate when a plaintiff has nonexertional impairments, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the grids." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). "If the guidelines adequately reflect a [plaintiff's] condition, then their use to determine disability status is appropriate." Id. at 605. It is only when a plaintiff's work capacity is significantly diminished by the nonexertional impairments to an extent beyond that caused by the exertional impairments that an ALJ should utilize a vocational expert to assess whether other work is available in the national economy that a plaintiff could perform. Id. at 605-06. The phrase "significantly diminished" refers to "the additional loss of work capacity beyond a negligible one . . . that so narrows [a plaintiff's] possible range of work as to deprive [him or her] of a meaningful employment opportunity." Id. at 606 (footnote omitted).

Plaintiff has failed to demonstrate that he suffered from nonexertional impairments that significantly diminished his work capacity. Although Plaintiff refers to the pain chronicled by several doctors (e.g., Dr. Rauschenbach and Crystal Run Healthcare), pain is itself neither an exertional nor a nonexertional limitation. Rather, pain may impose exertional or nonexertional limitations. See 20 C.F.R. § 404.1569a(b) ("When the limitations . . . imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that you have only exertional limitations."); 20 C.F.R. § 404.1569a(c)(1) ("When the limitations . . . imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions."); Butts v. Barnhart, 388 F.3d 377, 382 n.3 (2d Cir. 2004) (noting the difference between nonexertional limitations, such as stooping, kneeling,

26

crouching, and crawling, and allegations of pain).  Moreover, despite the ALJ's findings that Plaintiff was restricted from bending or stooping for more than half the work day, AR 19, the inability to bend on a repetitive basis is not inconsistent with a residual functional capacity for the full range of sedentary work.  "If a person can stoop[13] occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact."  SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985); see also SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983) (sedentary jobs do not require a significant amount of stooping).  Furthermore, despite the ALJ's finding that Plaintiff "cannot perform climbing activities," AR 19, this limitation likewise does not preclude exclusive reliance on the Medical-Vocational Guidelines.  SSR 96-9p states that "[p]ostural limitations . . . related to . . . climbing ladders, ropes, or scaffolds . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because [climbing is] not usually required in sedentary work."  1996 WL 374185, at *7 (S.S.A. 1996).[14]

---

[13]    Stooping is defined as "bending the body downward and forward by bending the spine at the waist."  SSR 85-15, 1985 WL 56857, at *5 (S.S.A. 1985).  SSR 85-15 does not address "bending" among the various postural impairments.  Instead, SSR 85-15 mentions "stooping, kneeling, crouching, and crawling," which are deemed "progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending."  Id.

[14]    In his motion papers, Plaintiff contends that Dr. Rauschenbach chronicled Plaintiff's limitations in bending and carrying.  See Pl.'s Mem. of Law in Supp. at 9.  However, Dr. Rauschenbach did not issue a medical opinion concerning the extent to which Plaintiff was limited in bending and carrying, nor do his records suggest that Plaintiff suffered from a greater limitation in bending (or carrying) than was found by the ALJ.  See AR 210-29.  Rather, the medical records show that on June 5, 2002, Plaintiff complained to Dr. Rauschenbach that he could "barely do anything more than mild bending, lifting," AR 224, while Dr. Rauschenbach noted that Plaintiff's MRI showed only mild stenosis and that there were no signs of radiculopathy.  Id.  In addition, even if Dr. Rauschenbach had issued a medical opinion regarding Plaintiff's limitations in carrying (or lifting), carrying and lifting are exertional requirements of work.

Finally, Dr. Hansraj's recommendation that Plaintiff "avoid bending, lifting, twisting, and reaching," AR 260, issued six months after Plaintiff's date last insured, does not establish that Plaintiff suffered from significant nonexertional impairments during the relevant time period, nor does the record suggest that Plaintiff was either completely prevented from engaging in such activities or limited to an extent inconsistent with a residual functional capacity for the full range of sedentary work. See id. 240 (Physical Residual Functional Capacity Assessment completed by Disability Examiner stated that Plaintiff can "occasionally" stoop, and no manipulative limitations were found),[15] 248-49 (Dr. Malizia opined that Plaintiff can "frequently" reach and "occasionally" stoop).

Based upon a careful review of the entire record, as summarized in Sections I.B. and I.C., supra, as well as in the ALJ's Decision, see AR 12-20, there is substantial evidence in the record to support the ALJ's finding that Plaintiff had the residual functional capacity to perform a full range of sedentary work. Therefore, the ALJ did not err in relying exclusively upon the Medical-Vocational Guidelines in reaching the decision that Plaintiff was not disabled.

**B.**     **Function-by-Function Assessment**

Plaintiff contends that the ALJ did not properly assess Plaintiff's residual functional capacity because the ALJ did not conduct a function-by-function assessment of Plaintiff's ability to do sustained work-related activities. See Pl.'s Mem. of Law in Supp. at 13-14. Plaintiff also maintains that the ALJ erred because he failed to make express findings regarding Plaintiff's

---

[15]     The Residual Functional Capacity Assessment lists the following possible manipulative limitations: reaching all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), feeling (skin receptors). AR 240.

ability to push or pull.[16]  SSR 96-8p states that the "RFC assessment must first identify the

individual's functional limitations or restrictions and assess his or her work-related abilities on a

function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§

404.1545 and 416.945.  Only after that may RFC be expressed in terms of the exertional levels

of work, sedentary, light, medium, heavy, and very heavy."  1996 WL 374184, at *1.

     Although the Second Circuit has yet to specifically address the requirement of a function-

by-function analysis, "other circuits have held that although a function-by-function analysis is

desirable, the ALJ's written opinion need not discuss each function, especially those functions

for which no limitation is alleged.  Within the Southern District of New York, courts have

reached different conclusions as to whether a function-by-function analysis is required or merely

desirable."  Messina v. Astrue, No. 09 Civ. 2509, 2009 WL 4930811, at *5 (S.D.N.Y. Dec 21,

2009) (footnotes omitted); see also Barone v. Astrue, No. 09 Civ. 7397, 2011 WL 7164421, at

*11 (S.D.N.Y. Dec. 27, 2011) ("At least two other circuits, though, aside from the Fifth Circuit,

have held that, while a function-by-function assessment is desirable, 'an ALJ's written decision

need not discuss each function,' and the Second Circuit has not specifically addressed the

question.") (footnote omitted) (citing Messina, 2009 WL 4930811, at *5), adopted by 2012 WL

382925 (S.D.N.Y. Feb. 6, 2012); Novak v. Astrue, No. 07, Civ. 8435, 2008 WL 2882638, at *3

(S.D.N.Y. July 25, 2008) (footnotes omitted) ("Although the Second Circuit has not specifically

addressed this question, several courts have held that the function-by-function requirement of

SSR 96-8p does not apply to the A.L.J.  The A.L.J. must avoid perfunctory determinations by

---

[16]     Seven strength demands are considered in assessing exertional capacity: sitting, standing, walking, lifting, carrying, pushing, and pulling.  SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996).

considering all of the claimant's functional limitations, describing how the evidence supports [his or] her conclusions, and discussing the claimant's ability to maintain sustained work activity, but [he or] she need not provide a narrative discussion for each function.")

In the present case, the ALJ provided a detailed summary of Plaintiff's medical records and testimony before reaching a determination regarding Plaintiff's residual functional capacity. See AR 15-19. The ALJ then found that "[b]ased on a consideration of the entire record in this case and after considering the claimant's demeanor while testifying, . . . [Plaintiff can] sit for a total of up to and including 8 hours and stand/walk a total of up to and including 4 hours during the course of an 8-hour work day; and has the ability frequently and occasionally to lift and carry objects weighing up to and including 10 pounds. Additionally, he cannot engage in bending or stooping more than 50% of the time . . . and he cannot perform climbing activities." Id. 19. While the ALJ did not assess Plaintiff's ability to push or pull, sedentary work does not require pushing or pulling. Rather, pushing and pulling are requirements of light work. See 20 C.F.R. § 404.1567(b) (light work encompasses some pushing and pulling of arm controls). Although the ALJ did not address each individual function, his decision provided ample support for his residual functional capacity finding.

### C.   **Credibility Determination**

Plaintiff argues that the ALJ failed to assess properly Plaintiff's credibility and subjective complaints of disabling pain. See Pl.'s Mem. of Law in Supp. at 15. In assessing Plaintiff's credibility, the ALJ determined "that the claimant's medically determinable impairment could have been reasonably expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence as of his date last insured." AR 18.

An ALJ's credibility determination is entitled to deference by a reviewing court. See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility findings, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted that "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment"); see also Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal quotation marks and citation omitted). Furthermore, the ALJ "is obligated only to consider a complainant's subjective complaints, not to accept all of them as dispositive." Rebull v. Massanari, 240 F. Supp. 2d 265, 274 (S.D.N.Y. 2002). When a claimant alleges symptoms that are more severe than the objective medical findings suggest, the ALJ may consider other evidence, including the claimant's daily activities, the nature, extent, and duration of his or her symptoms, medications taken, and the treatment provided, in assessing the claimant's credibility. 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ provided extensive reasoning to support his finding that Plaintiff's subjective complaints of pain were not credible to the extent alleged. As the ALJ stated, although the record contains evidence in support of Plaintiff's complaints of pain following the alleged onset date, the medical evidence does not pertain to a period prior to Plaintiff's date last insured. AR 18. Instead, the July, 2006, positive MRI of the lumbosacral spine, id. 262-65, and the September, 2006, positive electrodiagnostic studies, id. 282-84, were performed after

31

December 31, 2005, Plaintiff's date last insured.  Moreover, the ALJ elsewhere in his decision

pointed out that despite the results of the MRI and the electrodiagnostic studies, "follow-up

examinations performed by Dr. Hansraj on July 26, 2006 and October 9, 2006 continued to show

normal muscle strength in [Plaintiff's] lower extremities with normal reflexes and sensation." Id.

17 n.6; see id. 262-70.  Furthermore, the ALJ noted that Plaintiff managed his pain solely

through the use of over-the-counter medication prior to 2006. Id. 18.  Indeed, during Plaintiff's

examination with Dr. Margulies on October 18, 2005, which occurred during the relevant time

period, Plaintiff stated that he used only Tylenol to manage his pain. Id. 181.  The ALJ also

considered Plaintiff's June 13, 2007, hearing testimony that his back pain had become

particularly severe "in the past week," id. 18; see id. 384-86 (Plaintiff testified that the pain had

become "exceptionally worse" in the past few months and in the past week required Plaintiff to

get a prescription for Percocet), as evidence that Plaintiff's pain might be more recent than the

time period at issue.  As the ALJ noted, "physical examinations on and prior to [Plaintiff's] date

last insured did not show any muscle atrophy, muscle weakness, or significant neurological

deficits which would normally be expected in an individual with severe, debilitating

musculoskeletal pain." Id. 18.  Finally, the ALJ noted that the record did not contain evidence

that Plaintiff had ever been hospitalized or sought emergency room treatment for his back pain.

Id.  Thus, the ALJ's credibility determination is supported by substantial evidence, and there is

no basis to disturb these findings.[17]

---

[17]     To the extent that Plaintiff claims that the ALJ erred in failing to take account of
Plaintiff's prior work history in making his credibility determination, the Second Circuit has
stated, "To be sure, a good work history may be deemed probative of credibility.  Work history,
however, is just one of many factors appropriately considered in assessing credibility." Carvey
v. Astrue, No. 09-4438-cv, 2010 WL 2264932, at *3 (2d Cir. June 7, 2010) (internal quotation
marks and citations omitted); see also Whitfield v. Astrue, No. 08-CV-6427, 2010 WL 2925962,

**D.**     **Evaluation of the Chiropractor's Opinion/Failure to Develop the Record**

In a March 14, 2006, report from Plaintiff's treating chiropractor Carol Ann Malizia, she stated that Plaintiff was "totally disabled from his former occupation and quite frankly from any occupation at this point and time" because he "has no ability to work on any machinery, climb ladders, be exposed to any type of humidity or any type of weather changes due to the instability of the lumbar spine." AR 236.  In addition, on February 13, 2007, Dr. Malizia completed a medical source statement of Plaintiff's ability to do work-related activities in which she noted that Plaintiff could occasionally lift and carry 20 pounds or less and that during an 8 hour work day, Plaintiff could sit for two hours, stand for two hours, and walk for one hour, but would need to lie down intermittently for the rest of the time.  Id. 246-47.  Plaintiff contends that the ALJ erroneously failed to assign any weight to the opinion of Dr. Malizia.  See Pl.'s Mem. of Law in Supp. at 21.

However, a chiropractor is not an "acceptable medical source" as defined by the Social Security Regulations and therefore cannot provide a medical opinion.  See 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1513(d); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) ("Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide *medical* opinions.") (footnote omitted) (emphasis in

_____

at *5 (N.D.N.Y. July 23, 2010) ("It has been held that '[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,' however this factor alone is not dispositive of Plaintiff's credibility. Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir.1983) (citation omitted). In order to determine Plaintiff's credibility, it is proper for the ALJ to consider all factors relevant to Plaintiff's symptoms and base his determination on the totality of the evidence in the record. Mimms v. Heckler, 750 F.2d 180, 185-186 (2d Cir.1984)."), aff'd, 476 F. App'x 408 (2d Cir. 2012). In this case, the ALJ took into account the totality of the evidence in the record in deciding that Plaintiff's statements about the severity of his symptoms were not fully credible.

original).  Thus, the ALJ had the discretion to determine the appropriate weight to assign to Dr.

Malizia's opinion based on all available evidence.  See Diaz, 59 F.3d at 314 ("[U]nder no

circumstances can the regulations be read to *require* the ALJ to give controlling weight to a

chiropractor's opinion.") (footnote omitted) (emphasis in original).  Moreover, it is within the

sole discretion of the Commissioner to decide whether a claimant is disabled, and a treating

source's opinion on this issue cannot be controlling.  See 20 C.F.R. § 404.1527(e)(1); Snell v.

Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[A] treating physician's statement that the claimant is

disabled cannot itself be determinative.").

Plaintiff contends that the ALJ should have weighed the chiropractor's opinion in

accordance with SSR 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006).  SSR 06-03p states that

the factors set forth in 20 C.F.R. § 404.1527(d), which are applicable to the evaluation of

opinions from "acceptable medical sources," should likewise be applied to evaluate opinions

from "other sources."  2006 WL 2329939, at *4.[18]  However, SSR 06-3p also states, "The

evaluation of an opinion from a medical source who is not an 'acceptable medical source'

depends on the particular facts in each case.  Each case must be adjudicated on its own merits

based on a consideration of the probative value of the opinions and a weighing of all the

---

[18]      SSR 06-03p sets forth the following factors to be applied in the consideration of opinions from medical sources who are not "acceptable medical sources":
- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.
2006 WL 2329939, at *4-5.

evidence in that particular case." Id., at *5.  Moreover, an ALJ is not required to accord great

weight to opinions from sources other than "acceptable medical sources." Id. ("[I]t *may* be

appropriate to give more weight to the opinion of a medical source who is not an 'acceptable

medical source' . . . ") (emphasis added).  In this case, the ALJ did not fail to assign any weight

to Dr. Malizia's opinion; rather, he chose not to accord "great weight" to Dr. Malizia's opinion

that Plaintiff was "totally disabled . . . from any occupation" because "the issue of whether an

individual is 'disabled' or 'not disabled' is reserved to the Commissioner."  AR 19 (citing 20

C.F.R. § 404.1527(e)).  Instead, the ALJ chose to rely "on the medical reports provided by

physicians for the relevant period[19] which support a greater functional capacity."  Id.

     Thus, the ALJ noted that Plaintiff's treating physician, Dr. Rauschenbach, who had not

seen Plaintiff in the past 18-20 months, reported on January 4, 2006, a few days after Plaintiff's

date last insured, that Plaintiff complained of "increasing back pain with no associated numbness

or tingling" but "admitted pain relief with chiropractic treatment." Id. 16, 217.  In addition,

although Plaintiff had a slightly antalgic gait, he had "essentially normal" straight leg raising,

"no muscle weakness and no sensory deficits."  Id.  Plaintiff did not complain of difficulties with

---

[19]     "To be eligible for disability benefits, the claimant must demonstrate that [he or] she was disabled on the date [he or] she was last insured for benefits." Swainbank v. Astrue, 356 F. App'x 545, 547 (2d Cir. 2009) (citing Arnone v. Bowen, 882 F.2d 34, 37–38 (2d Cir.1989)). Thus, given that Plaintiff's date last insured was December 31, 2005, the ALJ could properly conclude that Dr. Malizia's "functional assessment" of Plaintiff provided over a year later in her February 13, 2007, medical source statement of Plaintiff's ability to do work-related activities was not entitled to"great weight." AR 19. Moreover, to the extent that Plaintiff relies on medical evidence from years before his alleged onset date of September 23, 2005, to establish that he was disabled during the relevant period, i.e., from September 23, 2005, to December 31, 2005, see Pl.'s Mem. of Law in Supp. at 18-19, it has already been determined that Plaintiff was not disabled as of September 22, 2005. See footnote 1, supra. Consequently, in making his decision, the ALJ was left to assess the limited evidence that existed related to the relevant (and likewise limited) time period.

sitting or walking, nor did he need any assistive devices to walk.  Id.  Dr. Rauschenbach took

new x-rays of Plaintiff, but the x-rays revealed "no major change" from x-rays taken in 2002.  Id.

217-18.  Likewise, the ALJ noted that an October 18, 2005, examination by chiropractor Dr.

Margulies "revealed decreased range of motion of the cervical and lumbar spines in all planes

with associated tenderness, but no muscle atrophy or sensory or reflex deficits were present . . .

Although no specific limitations in physical functioning were identified by the examiner, it was

evident that [Plaintiff] continued to experience back pain – but not the intensity of pain that

required prescribed pain medication."  Id. 15-16, 180-83.

In sum, the ALJ applied the proper standard under the Social Security Regulations in

determining what weight to give to Dr. Malizia's opinion and, as noted in Section III.A., supra,

there is substantial evidence in the record to support the ALJ's determination with respect to

Plaintiff's residual functional capacity.

Lastly, Plaintiff contends that the ALJ erred in failing to develop the record adequately

concerning Plaintiff's nonexertional impairments.  An ALJ is under an affirmative duty to

develop the record regardless of whether the Plaintiff is represented by counsel.  Pratts v. Chater,

94 F.3d 34, 37 (2d Cir. 1996).  In asserting that the ALJ did not properly develop the record,

Plaintiff does not explain how the record was deficient or how it ought to have been further

developed on this issue.  Plaintiff contends that "without question there is more than some

evidence of a non-exertional limitation."  See Pl.'s Mem. of Law in Supp. at 24.  Plaintiff further

contends that "throughout [Plaintiff's] testimony at the hearing and throughout his conversations

with his various doctors, [Plaintiff] consistently speaks of his pain and how it affects his ability

to function.  Not to develop this area of the record is error."  Id.  However, although Plaintiff

broadly cites his nonexertional impairments, he does not clearly specify the nonexertional

impairments that caused him pain and, as explained in Section III.A., supra, pain is itself neither an exertional nor a nonexertional limitation.  Furthermore, as explained in Section III.C., supra, there is substantial evidence to support the ALJ's determination that Plaintiff's subjective complaints of pain were not credible to the extent alleged.  Therefore, the record in this case was adequately developed.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's motion for judgment on the pleadings (Docket # 9) should be denied, the Commissioner's cross-motion for judgment on the pleadings (Docket # 15) should be granted, and the action should be dismissed.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Katherine B. Forrest at the United States Courthouse, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Forrest.

Dated: June 6, 2013
       White Plains, New York

                                         Respectfully submitted,

                                         Lisa Margaret Smith
                                         United States Magistrate Judge
                                         Southern District of New York

Copies of the foregoing Report and Recommendation have been sent to the following:

The Honorable Katherine B. Forrest, U.S.D.J.

Counsel of Record for Plaintiff and Commissioner of Social Security